## DUBUQUE AND SIOUX CITY RAILROAD CO. *v.* DES MOINES VALLEY RAILROAD CO.

IN ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

Argued October 29th, 1883.—Decided November 19th, 1883.

*Indian Titles—Iowa—Land Grants—Railroads.*

Previous decisions of this court have settled: 1. That the grant of lands in 1846 to Iowa Territory for the improvement of the Des Moines River did not extend above the Raccoon Fork. 2. That the odd numbered sections within five miles of the river above Raccoon Fork and below the east branch, to which Indian title had been extinguished, did not pass under the act of 1856, granting lands to Iowa to aid in the construction of railroads. 3. That the act of 1862 transferred the title from the United States and vested it in Iowa for the use of its grantees under the river grant.

The court now decides: 4. That when the act of 1862 took effect, there was no Indian title in the way of the grant, and the title of the defendants in error in this suit was perfected. 5. That the reservation made by the executive under the act of 1846 is to have effect according to its terms, and not according to any mistaken interpretation which may at some time have been given to it.

Action to recover lands and quiet title. It was commenced in the Humboldt District Court in the State of Iowa. The present plaintiffs by petition set forth that in May, 1856, Congress granted to the State of Iowa, for the purpose of aiding in constructing a railroad from Dubuque to Sioux City, every alternate section of land designated by odd numbers, for six sections in width, on each side of said road; that this grant became vested in the plaintiffs: and that the present defendants had wrong-

fully procured from the land office an illegal certification to certain designated sections within the grant, whereby the plaintiff's title was disquieted, and they prayed judgment that the lands might be decreed to them.

The answer set up that the lands in question were set apart prior to the act of 1856, as part of the lands granted to the State of Iowa by the act of August 8th, 1846, and that the defendants had succeeded to the rights of the State under the latter grant, and were entitled to the lands in controversy.

The district court gave judgment in favor of the plaintiffs. The supreme court of the State on appeal reversed that judgment. The cause was brought before this court, by writ of error. The facts necessary to the understanding of the issues involved appear in the opinion of the court.

*Mr. Charles A. Clark* for the plaintiffs in error.

*Mr. C. C. Nourse* and *Mr. B. F. Kauffman* for the defendants in error.

Mr. Chief Justice Waite delivered the opinion of the court.

The following are no longer open questions in this court:

1. That the grant of lands to the Territory of Iowa for the improvement of the Des Moines River, made by the act of August 8th, 1846, c. 103, 9 ½ at. 77, did not extend above the Raccoon Fork. *Dubuque & Sioux City Railroad Company* v. *Litchfield*, 23 How. 66.

2. That, notwithstanding this, the odd-numbered sections within five miles of the river, on each side, above the Raccoon Fork and below the east branch, to which the Indian title had been extinguished, were so far reserved, " by competent authority," for the purpose of aiding in the improvement of the Des Moines, that they did not pass under the act of May 15th, 1856, c. 28, 11 Stat. 9, granting lands to the State of Iowa to aid in the construction of certain railroads; and—

3. That the act of July 12th, 1862, c. 161, 12 Stat. 543, " transferred the title from the United States and vested it in the State of Iowa, for the use of its grantees under the river grant." *Wolcott* v. *Des Moines Company*, 5 Wall. 681; *Will-*

*iams* v. *Baker*, 17 Wall. 144; *Homestead Company* v. *The Valley Railroad Company*, 17 Wall. 153; *Wolsey* v. *Chapman*, 101 U. S. 755, 767.

The lands involved in this suit are odd-numbered sections, located in Iowa, within five miles of the Des Moines, above the east fork, and it is insisted that they did not pass under the act of 1862, because,

1. When the reservation for the river improvement was made the Indian title had not been extinguished, and they were not then part of the public lands of the United States; and

2. The reservation, as in fact made, was along the east branch, and not the main river, where these lands are.

These objections present the only questions we have now to consider.

1. As to the Indian title.

It is conceded that when the act of 1846 was passed all Indian titles had been extinguished, except such as belonged to certain bands of the Sioux. By a treaty between the United States and the Sacs and Foxes, the Medawah-Kanton, Wahpacoota, Wahpeton, and Sissetong bands or tribes of Sioux, and the Ottawas, Iowas, Ottoes, and Missourias, concluded on the 15th of July, 1830, and proclaimed on the 24th of February, 1831, 7 Stat. 328, certain lands were ceded and relinquished to the United States "to be assigned and allotted, under the direction of the president of the United States, to the tribes now living thereon, or to such other tribes as the president may locate thereon, for hunting and other purposes." The north line of this cession is described in the treaty as follows:

"Beginning at the upper fork of the Des Moines River and passing the source of the Little Sioux and Floyds Rivers to the fork of the first creek which falls into the Big Sioux or Calumet on the east side."

The lands north of this line were occupied by the Sioux, and those south were held by the United States for the purposes set forth in the treaty. Whether the lands in controversy in this suit are situated north or south of this boundary line depends on whether the east branch or the Lizard made the

upper fork of the Des Moines, as understood by the parties when the treaty was concluded. If the Lizard, then all are north of the line; if the east branch, all, or nearly all, are south.

On the 28th of July and the 5th of August, 1851, treaties were negotiated with the Sioux, by which they surrendered all their title to lands in Iowa. The ratification of these treaties, in the form they were originally made, was not advised by the Senate, but on the 23d of June, 1852, certain amendments were proposed, on the acceptance of which the President was authorized to conclude the treaties " as amended." The amendments were agreed to by the Indians on the 4th and 8th of September, 1852, and the ratification of the treaties was duly proclaimed on the 24th of February, 1853.

The grant to Iowa under the act of 1846 was of " one equal moiety, in alternate sections, of the public lands (remaining unsold, and not otherwise disposed of, encumbered, or appropriated), in a strip five miles in width on each side of said river, to be selected," &c., and the odd-numbered sections were afterwards selected. A question arose as to the extent of this grant, and as early as February 23d, 1848, the commissioner of the general land office certified to the officers of the State that, in the opinion of " his office," the State was " entitled to the alternate sections within five miles of the Des Moines River throughout the whole extent of that river within the limits of Iowa." The State claimed that the grant extended from the mouth of the river to its source. Notwithstanding the opinion of the land office and the claim of the State, a proclamation was issued by the president on the 19th of June, 1848, ordering into market some of the lands which lay above the Raccoon Fork. This led to a protest on the part of the officers of the State, and a correspondence between the representatives of the State in Congress and the secretary of the treasury, whose department then had charge of the public lands, which resulted in the announcement by the secretary, on the second of March, 1849, of his opinion that the grant extended from the mouth to the source of the river, not, however, including any lands in the State of Missouri. In accordance with this opinion, instructions were issued from the general land officers to the land .

officers in Iowa, on the 1st of June, 1849, "to withhold from sale all the lands situated in the odd-numbered sections within five miles on each side of the river above the Raccoon Forks." This, however, did not settle the matter, and conflicting opinions were announced at various times by different officers of the executive departments of the government. Finally, on the 22d of February, 1851, the State officers formally notified the secretary of the interior, to whose department the charge of the public lands had before that time been assigned, of the demand by the State of "all the odd sections of land within five miles of the Des Moines River above the Raccoon Fork." After this the whole matter was brought before the president and cabinet, and the decision arrived at by them is indicated in the following letter of the secretary of the interior:

"DEPARTMENT OF THE INTERIOR,
WASHINGTON, *October* 29, 1851.

"SIR : I herewith return all the papers in the Des Moines case, which were recalled from your office about the first of the present month.

"I have considered and carefully reviewed my decision of the 26th July last, and in doing so find that no decision which I can make will be final, as the question involved partakes more of a judicial than an executive character, which must ultimately be determined by the judicial tribunals of the country, and although my own opinion on the true construction of the grant is unchanged, yet in view of the great conflict of opinion among the executive officers of the government, and also in view of the opinions of several eminent jurists which have been presented to me in favor of the construction contended for by the State, I am willing to recognize the claim of the State, and to approve the selections without prejudice to the rights, if any there be, of other parties, thus leaving the question as to the proper construction of the statute entirely open to the action of the judiciary. You will please, therefore, as soon as may be practicable, submit for my approval such lists as may have been prepared, and proceed to report for like approval lists of the alternate sections claimed by the State of Iowa above the Raccoon Forks, as far as

the surveys have progressed or may hereafter be completed and returned.

"Very respectfully, etc., etc.,

"A. H. H. STUART, *Secretary.*

"*The Commissioner of the General Land Office.*"

In obedience to these instructions, lists were made out as the surveys progressed, and submitted to the secretary for his approval. His last approval, before the passage of the railroad grant of 1856, was on the 17th of December, 1853. The lands now in controversy were not surveyed at that time, and were not included in this or any of the lists previously made.

It is undoubtedly true, as was said in *Leavenworth, &c., Railroad* v. *The United States,* 92 U. S. 733, 743, that, "in the absence of words of unmistakable import," it will not be presumed that Congress has made a grant of lands to which the Indian title has not been extinguished ; but there are, nevertheless, instances, as in the case of the Pacific railroads, where this has been done. Confessedly, however, in this case the congressional grant of 1846 did not include the lands now in controversy. Whatever reservation there was to interfere with the railroad grant of 1856, grew out of what was done by the executive officers of the government after the act of 1846 was passed, and while its effect was in doubt. That the State claimed all the alternate sections within five miles of the river on each side, and as far north as the State line, is not denied. That the intention of the president and his cabinet was to make the reservation as broad as the claim is to our minds perfectly apparent from the language of the instructions of the secretary of the interior to the commissioner of the general land office in his communication of the 29th of October, 1851. His words are :

"I am willing to recognize the claim of the State and approve the selections without prejudice to the rights, if any there be, of others, thus leaving the question as to the proper construction of the statute entirely open to the action of the judiciary."

He then directed lists of selections to be prepared and sub-

mitted for his approval as the surveys were completed and returned. At this time all the Indian title that could, by any possibility, interfere with the grant as claimed by the State was in the process of extinguishment. Treaties which were to have that effect had already been negotiated with the Indians, and were waiting ratification by the United States. There could hardly have been a doubt in the minds of any of the parties that long before any judicial determination of the matters in dispute every vestige of Indian title would be gone. Hence, to leave "the question of the construction of the statute," that is to say, the effect of the grant, "entirely open," all the lands within the limit, surveyed or unsurveyed, and, as we think, encumbered by an Indian title, or unencumbered, were reserved from sale until the "action of the judiciary." This reservation was in force when the act of 1856 was passed, and it is *the* reservation which this court has held prevented the grant under that act from attaching to the lands within the limits of the river grant, as claimed by the State. The act of 1862 afterwards, in express terms, granted to the State, for the use of its grantees, "the alternate sections designated by odd numbers lying within five miles of said river, between the Raccoon Fork and the northern boundary of the State." At this time there was no Indian title in the way of the grant, and if the reservation was good as against the railroad companies in 1856, the title of the Des Moines Valley company, the grantee of the State, was perfected.

2. As to the east branch.

Much of what has been said about the Indian title applies to this objection. The State claimed the lines along the river, and the reservation as promulgated was of what was claimed. No one now supposes the east branch was in fact the Des Moines River. It is undoubtedly true that at some time some officers of the government, as well as some officers of the State, supposed the branch was the main river, and acted accordingly; but that does not change the geographical fact that what was taken for the river was only a branch. The lists of selections along the branch, and their approval by the secretary, were mistakes, which the record shows were corrected in the final

settlements between the State and the United States by allowances in account. The same may be said of the marks on the plats sent out from the general land office to the local land officers. They were clerical mistakes, growing out of an imperfect knowledge of the geography of the country. They did not change the reservation, but only gave wrong information as to what it was. There is no question of estoppel as a consequence of the mistake involved. The railroad grant of 1856 was subject to the reservation for the river grant. There is no pretence of fraud anywhere, and the record does not show that the conduct of the appellants or their grantors has been in any way influenced by the plats or the unauthorized selections and certificates. They knew, or ought to have known, that the reservation was confined to the river lands, and that the branch was not the river. Hence the reservation is to have effect according to its terms, and not according to any mistaken interpretation which may at some time have been given to it.

We find no error in the record, and the

*Judgment is affirmed.*