NORTHERN PAC. R. Co. *v.* ST. PAUL, M. & M. RY. Co. and others.

*(Circuit Court, D. Minnesota.  March 3, 1886.)*

RAILROAD LAND GRANTS—INTERSECTING GRANTS—TITLE OF NORTHERN PACIFIC RAILROAD COMPANY AND ST. PAUL, MINNEAPOLIS & MANITOBA RAILWAY COMPANY AT GLYNDON.
  The title of the Northern Pacific Railroad Company to the lands embraced in the land grants to it and to the companies from which the St. Paul, Minneapolis & Manitoba Railway Company derived title where such roads cross at Glyndon, Minnesota, antedates and is superior to the title of the St. Paul, Minneapolis & Manitoba Railway Company.

BREWER, J.  The two principal contestants in this case are land-grant railroad companies.  Their lines cross at Glyndon; and the contest is as to the title to lands in the vicinity of this crossing, and embraces lands in place, indemnity lands, and lands within withdrawal limits.  The first inquiry naturally runs to lands in place.

Congress, by different acts, at different times, grants the alternate odd-numbered sections on either side to two roads.  Their lines cross.  In the vicinity of the crossing, obviously, certain sections are within the letter of each grant.  Which takes the title?  In view of the many land grants it was to be expected that this question would early arise.  It has arisen, and the primary rule of determination been settled.  First it was held that, upon construction of the road, the grant took effect, and, by relation, as of the date of the act making the grant.  "The grant then becomes certain, and, by relation, has the same effect upon the selected parcels as if it had specifically described them."  *Railroad Co.* v. *U. S.*, 92 U. S. 741.  "The grant takes effect upon the sections, by relation, as of the date of the act of congress.  In that sense we say that the grant is one *in præsenti*.  It cuts off all claims other than those mentioned, to any portion of the lands, from the date of the act, and passes the title as fully as though the lands had been capable of identification.  *Van Wyck* v. *Knevals*, 106 U. S. 365; S. C. 1 Sup. Ct. Rep. 336; *Railway Co.* v. *Alling*, 99 U. S. 475; *Missouri, K. & T. Ry. Co.* v. *Kansas Pac. Ry. Co.*, 97 U. S. 498."  And then, as a corollary, the supreme court ruled that as between two roads, not priority of construction, nor priority of location, but priority of grant determined the title:

"The construction thus given to the grant in this case is, of course, applicable to all similar congressional grants, and there is a vast number of them, and it will tend, we think, to prevent controversies between the grantees and those claiming under them respecting the title to the lands covered by their several grants, and put an end to struggles to encroach upon the rights of others by securing an earlier location.  Our judgment is that the title of the plaintiff, attaching to the lands in controversy by a location of the route of the road, being followed by a construction of the road, took effect, by relation, as of the date of the act of 1862, so as to cut off all intervening claimants, except in the cases where reservations were specially made in that act, and the amendatory act of 1864.  *   *   *   The grant made was in the

nature of a float, and the reservations excluded only specific tracts, to which certain interests had attached before the grant had become definite, or which had been specially withheld from sale for public uses, and tracts having a peculiar character, such as swamp lands or mineral lands, the sale of which was then against the general policy of the government. It was not within its language or purpose to except from its operation any portion of the designated lands for the purpose of aiding in the construction of other roads." *Missouri, K. & T. R. Co.* v. *Kansas Pac. R. Co.*, 97 U. S. 491.

The rule thus established easily settles most similar controversies. Comparing the date of one act of congress with that of another is all that must be done. · Unfortunately in this case the solution is not so simple and easy. Which road has the prior grant? A reference to the legislation is necessary. The title of the Northern Pacific Railroad Company to these lands rests upon the act of July 2, 1864. 13 St. at Large, 265. The third section contains the grant:

"And be it further enacted, that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad, whenever it passes through any state, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office; and whenever, prior to said time, any of said sections or parts of sections, shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections: provided, that if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act: provided, further, that the railroad company receiving the previous grant of land may assign their interest to said Northern Pacific Railroad Company, or may consolidate, confederate, and associate with said company upon the terms named in the first section of this act: provided, further, that all mineral lands be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest to the line of said road, may be selected, as above provided."

The road having been constructed, the grant, by relation, takes effect as of that date, July 2, 1864. Of this there can be no doubt. The defendant claims that its grant was made by the act of March 3, 1857, more than seven years prior. This is the matter in dispute. The first section of the act of 1857 makes this grant:

"That there be, and is hereby, granted to the territory of Minnesota, for the purpose of aiding in the construction of railroads from Stillwater, by way of St. Paul and St. Anthony, to a point between the foot of Big Stone lake

and the mouth of Sioux Wood river, with a branch via St. Cloud and Crow Wing to the navigable waters of the Red River of the North, at such point as the legislature of said territory may determine, every alternate section of land designated by odd numbers, for six sections in width, on each side of each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any section, or any part thereof, granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said territory or future state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of pre-emption have attached as aforesaid, which lands thus selected in lieu of those sold, and to which pre-emption rights have attached as aforesaid, together with sections and parts of sections designated by odd numbers, as aforesaid, and appropriated as aforesaid, shall be held by the territory or future state of Minnesota for the use and purpose aforesaid: provided, that the land to be so located shall in no case be further than fifteen miles from the lines of said roads or branches, and selected for and on account of each of said lines or branches: provided, further, that the said lands hereby granted for and on account of said roads and branches severally shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatever; and provided, further, that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads and branches through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the president of the United States."

The "branch via St. Cloud," etc., is the line which crosses the Northern Pacific road at Glyndon, and presents the matter in dispute. The legislature of Minnesota named St. Vincent, a place on the northern boundary of the state, as the terminal point on the Red river. At first, the Minnesota & Pacific Railroad Company was made the beneficiary of this grant, but subsequently, and on March 10, 1862, by proper legislative action, the St. Paul & Pacific Railroad Company, of which the principal defendant is the successor, became the beneficiary. On July 12, 1862, a portion of this grant was vacated by resolution of congress, as follows:

"Be it resolved by the senate and house of representatives of the United States of America in congress assembled, that in lieu of that part of the railroad grant to Minnesota territory by act of congress, approved third of March, 1857, which extends north-westerly from the intersection of the tenth standard parallel with the fourth guide meridian, there shall be granted to the state of Minnesota the alternate sections, within six-mile limits of such new branch line of route, as the authorities of the state may designate, having its south-western terminus at any point on the existing line, between the falls of St. Anthony and Crow Wing, and extending in a north-easterly direction to the waters of Lake Superior, with a right of indemnity between the fifteen-mile limits thereof: provided, this resolution shall take effect from the filing in

the general land-office of the acceptance by the authorities aforesaid of such substitution, whereupon the land north of the intersection aforesaid in the grant, as authorized by the said act of third March, 1857, being by said acceptance disincumbered of the railroad grant, shall be dealt with as other public lands of the United States."

The proper acceptances were filed, so that the proposed change became operative. On March 3, 1865, congress passed an act enlarging the grant of 1857 to 10 sections per mile, the ninth section of which reads as follows:

"And be it further enacted, that the provisions of this act shall also be construed so as to apply and extend to that portion of the line authorized to be vacated by the joint resolution approved July 12, 1862, entitled "A joint resolution authorizing the state of Minnesota to change the line of certain branch railroads in said state, and for other purposes; notwithstanding the vacation thereof by said state, as though said joint resolution had not passed, and also to the line adopted by said state in lieu of the portion of the line so vacated."

On March 3, 1871, congress passed a further act entitled "An act authorizing the St. Paul & Pacific Railroad Company to change its line, in consideration of a relinquishment of lands," which reads:

"Be it enacted, etc., that the St. Paul & Pacific Railroad Company may so alter its branch lines that, instead of constructing a road from Crow Wing to St. Vincent, and from St. Cloud to the waters of Lake Superior, it may locate and construct in lieu thereof a line from Crow Wing to Brainerd, to intersect with the Northern Pacific Railroad, and from St. Cloud to a point of intersection with the line of the original grant at or near Otter Tail or Rush Lake, so as to form a more direct route to St. Vincent, with the same proportional grant of lands, to be taken in the same manner, along said altered lines as is provided for the present lines by existing laws: provided, however, that this act shall only take effect upon condition of being in accord with the legislation of the state of Minnesota, and upon the further condition that proper releases shall be made to the United States by said company of all lands along said abandoned lines from Crow Wing to St. Vincent, and from St. Cloud to Lake Superior, and that, upon the execution of said releases, such lands so released shall be considered as immediately restored to market without further legislation."

Counsel for defendant speak of these odd-numbered sections as "granted by act of congress of March 3, 1857, and located under the act of congress, March 3, 1871." Now, if this is a fair description of defendant's title, its grant is, of course, of prior date, and we must look to the exceptions named therein for any support of complainant's title. I am unable to agree with counsel in this respect. Reading the legislation of congress as interpreted by the geography of the state, it is obvious that prior to the act of March 3, 1871, there was no thought of a road down the valley of the Red river, or crossing the Northern Pacific line within a hundred miles of Glyndon, and the fair construction of that act makes a new grant in lieu of one revoked. The grant of 1857 was for a branch road, via St. Cloud and Crow Wing, to St. Vincent. Where a grant is made to aid in the construction of a road between two named *termini*, the amount of the grant being proportioned to the length of the road, the necessary implication is

that the road is to be constructed in as direct a line between such *termini* as the topography will reasonably permit. No gigantic bow, adding from 30 to 50 per cent. to the amount of the grant, can be considered within the contemplation of the grantor. A road passing through St. Cloud and Crow Wing will, in a direct line towards St. Vincent, course a little north of north-west; while, to go from Crow Wing to Glyndon, the road will pass about a hundred miles nearly due west; and then, to reach St. Vincent, turn at almost a right angle, and run north down the Red River valley. The most casual glance at the map shows that no such line was in the thought of congress when it passed the act of March 3, 1857; but if there were any possible doubt after a consideration of this act alone, that doubt is removed by the act of July 12, 1862. That vacates this grant, north-westerly "from the intersection of the tenth standard parallel with the fourth guide meridian." This furnishes in the thought of the grantor a new point on the line of the intended grant, viz., the point of intersection, etc. Now, this point is on the direct line from Crow Wing to St. Vincent, and is ninety miles east and six miles north of Glyndon. Of course, this excludes the idea of a line which, to reach St. Vincent via Glyndon, must turn on itself, come south six miles, then west ninety miles, and then, at a right angle, push directly north to its terminus. It is true, this named point of intersection lies 40 miles north of the Northern Pacific line, and if the road had been constructed so as to earn that grant it would have crossed the road of complainant, and obtained a prior title to the land within the conflicting limits. But, without subsequent legislation, the construction of a road on the present line would have given defendant no pretense of title to any lands within the limits of complainant's grant; for, while the act of 1857 made no definite location of the line of road, therefore did not designate the precise sections granted, and so had some of the elements of a float, yet it did define the general boundaries of the grant, was in no complete sense a float, and did not give a right to lands wherever, in the unoccupied public domain, the grantee might see fit to build its road.

Turning now to the act of 1871, and what is its fair construction? Bear in mind that at that date there was an existing grant, whose general boundaries were indicated, unearned, and along a line of road which had not been built and might never be. The title to the act suggests its purport. Authorizing a change of line "in consideration of relinquishment of lands." Evidently a vacation of some existing grant was the condition—the consideration—of whatever congress was proposing to give by this act. The act itself provides, first, that the donee may, in lieu of certain authorized branch lines, construct certain other branch lines and that along these new lines it may have the same proportional grant, upon two provisos: *First*, accord with the legislation of Minnesota; and, *second*, a full relinquishment of all claims to land along the original branch lines, which land it was fur-

ther enacted should then be immediately restored to market. Could anything be clearer than that, upon the acceptance of this act, the old grant was surrendered, and in lieu thereof a new one taken. The act does not provide for relocating existing branches, but for new ones in lieu of those existing. It does not transfer an existing grant, but makes a new grant of a proportional amount along the new lines, and requires, as a condition, a formal release of "all lands along said abandoned lines." I am aware that the force of the foregoing argument is somewhat weakened by the fact that in 1869 the St. Paul & Pacific Company caused a survey and location to be made of a line from Crow Wing towards St. Vincent, such line passing westerly from Crow Wing about half the distance towards Glyndon, then turning north, and passing between Otter Tail and Rush lakes in the direction of St. Vincent to a point about 15 miles north of the tenth standard parallel. This line, if extended to St. Vincent, would have run about half way between the present constructed road from Glyndon northward, and a line running directly from Crow Wing through the point of intersection named in the act of 1862. A map of this survey and location was filed in the office of the secretary of the interior on December 9, 1869, but never accepted by that department; the secretary holding that *prima facie* it was an unwarrantable departure from the true line, and that before acceptance proof must be made that a direct route was impracticable. Now the act of 1871 names as one of the new branches a line "from St. Cloud to a point of intersection with the line of the original grant at or near Otter Tail or Rush lake." This, it is claimed, is congressional recognition of that survey and line, and an implied assent to the claim of the company that such line was within the scope of the original granting act. There is doubtless truth and force in this, but not sufficient, in my judgment, to overthrow the conclusions reached from the other facts. These reasons suggest themselves. It is obviously inconsistent with the act of 1862. The description may have resulted from congressional ignorance of geographical facts. As all that was sought was description of the new line, anything which would make that plain was in order, and should not be carried beyond the mere purpose of description. As this survey of 1869 was the only one on file in the department or as yet made by the company, a reference to that would give the most certainty to the description. The act was passed long after the grant to the Northern Pacific, and no mere implication should defeat or limit that grant. The road, as constructed, nowhere runs within 20 miles of that line, and at the point of crossing the Northern Pacific is more than 30 miles distant. While, as between the government and its grantee, any departure is waived if not insisted upon by the former, yet, as between two donees contesting for rights in the same lands, large departures ought certainly to have weight in determining title. My conclusion, then, from the foregoing is that the Northern Pacific grant is prior.

But this only introduces me to another question: Assuming the priority of the Northern Pacific grant, it is earnestly contended that by its terms all subsequent grants made prior to the definite location of its road are excepted. The definite location, it is conceded, was not made until after the act of 1871. The difference between the language of the grant to the Union Pacific, construed in 97 U. S., *supra*, and that in the grant to the Northern Pacific, is the basis of this argument. The former grant reads thus:

"Five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached, at the time the line of said road is definitely fixed." 12 St. at Large, 492, § 3.

In the latter we find these words:

"And whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office, and whenever, or prior to said time, any of said sections, or parts of sections, shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

The question is as to the intent of congress in these acts; for as to its power as owner to dispose of these lands as it pleases there can be no question. In *Missouri, K. & T. Ry. Co.* v. *Kansas Pac. Ry. Co.*, 97 U. S. 497, the supreme court said:

"It is always to be borne in mind in construing a congressional grant that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of congress. That intent should not be defeated by applying to the grant the rules of the common law, which are properly applicable only to transfers between private parties. To the validity of such transfers it may be admitted that there must exist a present power of identification of the land, and that where no such power exists instruments with words of present grant are operative, if at all, only as contracts to convey. But the rules of the common law must yield in this, as in all other causes, to the legislative will."

We are not limited, therefore, to the technical force and meaning of terms as used in conveyances and contracts between individuals. We must construe this act as any other law of congress, and ascertain from all means at command the intent of the legislator. Stress is laid on the use of the word "granted" in the one act, and its omission from the other. This word it is claimed has a well-recognized meaning in the land legislation of congress, distinct from "sale," "pre-emption," and "homestead." Its use indicates the intention of future grants within this territory, and notifies the grantee that such future grants, if made before its definite location, will have precedence. In fact it reserves from this all such future grants. The vastness of this grant, and the wide range given for the location of

the road, are suggested as reasons why congress increased the exceptions previously made in the Union Pacific act. The fact, as stated, that this is the only land-grant act in which this word is used in a similar connection is noticed as evidence of the intent. At the hearing, the arguments in favor of these views were forcibly presented, and seemed to me very persuasive. Subsequent reflection has led me to a different conclusion. I state briefly my reasons. The decision in 97 U. S., *supra*, places all land-grant roads on the same plane,—and that, a different one from that occupied by settlers and private purchasers,—and settles all conflicts of title by a rule clear, simple, and just, viz., priority of grant. Congress may fairly be regarded as standing indifferent between all roads, and intending to apply this just and simple rule of priority as between successive beneficiaries. Before any departure from such intent is adjudged, the fact should be made clear. The burden is on the later beneficiary averring such departure. The language of each act is broad, and covers every possible disposition by the government intermediate the act and the location: "Sold, reserved, or otherwise disposed of " in one; "reserved, sold, granted, or otherwise appropriated," in the other. Is any term broader or more comprehensive than "disposed of?" Used in a similar private contract between individuals, would any one doubt the sweep of the exception? Yet the supreme court ruled that it did not except "any portion of the designated lands for the purpose of aiding in the construction of other roads." Counsel would limit the scope of the term on the principle *noscitur a sociis.* The use of the qualifying word "otherwise" makes against the application of that principle. But, giving it full force, is not a grant a disposition kindred to a sale, if not a reservation? Counsel's argument rests on the technical force of the phraseology, while I understand the supreme court to base the rule on the presumed attitude of congress towards such public improvements. While the grant is vast, the line to be constructed in order to earn it is continental. The grant was make because congress believed the public good required the road, and, in view of the length of the line, the character of the country through which it was to pass, the paucity of settlements therein, and the supposed difficulties in the operation of a road in that northern latitude, it is fairer to presume that congress intended the freest bounty, rather than to believe that it burdened the grant with extra exceptions, which, when construction became feasible, might largely deplete it of value. Further, congress had in thought at the time other railroad grants, and in the first proviso made special provision therefor. It there deducted from this grant any lands theretofore granted to any road whose line should prove to be upon the same general route, and authorized consolidation of companies. Without consolidation, the Northern Pacific would fail of such lands, and that without any right of indemnity elsewhere along its line. If further special provision for conflict with other land grants was intended,

would not such intention have been made manifest by further proviso, or at least by language of unmistakable import. I can but think the rule laid down in 97 U. S. *supra*, applicable to the Northern Pacific land grant, and therefore must hold that its title to the lands in place antedates that of the defendant.

But it is said that the Northern Pacific is estopped from claiming title to these lands. The defendant claims title by foreclosure of a mortgage given by the St. Paul & Pacific Company of date April 1, 1871. At the time of the passage of the act of March, 1871, as well as at the time of the execution of the mortgage just referred to, the Northern Pacific Company was the owner of substantially all the stock in the St. Paul & Pacific Company, elected its directors, and controlled its actions. The act of March, 1871, was passed at the instance of the Northern Pacific. The bonds secured by said mortgage were negotiated by a committee representing the mortgagor, but really named by the Northern Pacific Company. The bonds were headed: "First mortgage bond upon 348 miles of railroad and 2,217,-200 acres of land." The bond also referred to the accompanying mortgage, and its recitals, so far as they bear on this matter, are as follows:

"And which conveys also to the said trustees all the right, title, and interest which the company last aforesaid now has, or shall or may hereafter acquire, by the construction of said railroads, or any part thereof, or otherwise, in, to, or concerning certain lands situate in the said state, which were heretofore granted by the congress of the United States to aid in the construction of such railroads, by acts of the said congress approved, respectively, March 3, 1857, March 3, 1865, and March 3, 1871, the extent and aggregate area of such lands to which said company will become entitled by the construction of said railroads, under existing legislation, being estimated at two millions two hundred and seventeen thousand and two hundred acres, more or less."

The granting part of the mortgage alluded to the lands in the following terms:

"And also all right, title, and interest which said party of the first part now has, and all right, title, and interest which the said party of the first part, its successors or assigns, shall or may at any time hereafter acquire, by reason of the construction of said railroads, or of either, or of any part of either thereof, or otherwise, in, to, or concerning the lands situate, lying and being in the state of Minnesota, which are embraced, or intended to be embraced, in the grants aforesaid, or either of them, made by the congress of the United States to the former territory and present state of Minnesota by the acts of said congress hereinbefore mentioned, or either of them, and which have been granted by said state to the party of the first part, or shall or may be granted or conveyed to the said party of the first part, its successors or assigns, to aid in the construction of the said lines of railroad, or of either, or of any part of either thereof."

In order to make the number of acres named, the grant must have been full. Now, I fail to see how anything done before the issue of these bonds can have any bearing on the matter of estoppel. If the Northern Pacific owned both properties, why could it not secure any

legislation it wished in reference to either without wronging any one? Perhaps the change in location of branches may have been to the interest of the Northern Pacific, but it was no more than taking money out of one pocket and putting it in another. All belonged, both before and after the change, to the Northern Pacific. Assuming that the Northern Pacific is responsible for the representations in the bonds and mortgage as having put the words in the mouth of the mortgagor, I cannot think there is anything in them to preclude it from asserting any legal title it may have to these lands. The representation was in terms only an estimate. The line of the road had not been definitely located. Its exact length could not be positively affirmed. The distance given was of course only an approximation. The grant was proportioned to the length. Suppose there had been no conflict of grant, and the road, as built, had fallen short eight miles of the distance named, would the Northern Pacific have been bound to make up the deficiency in the area of the grant? Parties are assumed to act and negotiate on the basis of a knowledge of general and notorious facts. The acts under which the grant was made were named in the instruments. The extent and limitations of the grant were thus declared. Nowhere is it suggested that the grant would be satisfied by the lands in place, and no recourse necessary to the indemnity limits. It was generally known that the country along the proposed line was sparsely occupied. It may have been expected that little recourse would be necessary to the indemnity limits, but the facts were stated, and the purchaser of the bonds took his chances thereon. But counsel urge, according to the present claim of the Northern Pacific, the lands within its limits were not included in the St. Paul & Pacific grant, and therefore for them there could be no indemnity. Assume that such is the correct construction, yet the representation contains no intimation that the Northern Pacific intended to waive its legal rights. Nothing was concealed. The sources of title were disclosed. The limitations therein were patent. If assurance from the Northern Pacific was desired, it should have been asked. The purchasers took all chances as to the construction of either road, and were bound to assume that each would claim and receive its legal right. To sustain an estoppel under these circumstances would carry the doctrine far beyond any adjudicated case, as well as beyond the demands of equity and justice.

I turn now to the consideration of the contest, so far as it relates to lands within the withdrawal limits of the Northern Pacific. On August 13, 1870, a map of the general route to the western boundary of Minnesota was filed in the interior department, and a withdrawal made by that department. Subsequently, and on October 12, 1870, an amended map of general route was filed and a second withdrawal made. This second withdrawal is the only one to be considered, for lands not within its limits were restored. This withdrawal was before the act of 1871. Was the grant made by that act inoperative

within its limits? The withdrawal was in terms "from sale, preemption, homestead, and other disposal." The act of 1857 contains this proviso:

"And provided, further, that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads and branches through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the president of the United States." 11 St. at Large, 196.

The act of 1865 contains a similar provision, and the act of 1871 provided that the grant "be taken in the same manner, along said altered lines, as is provided for the present lines by existing laws," so lands reserved from disposal by competent authority at that date were in terms excepted from the grant. Both the validity and extent of this withdrawal are challenged. Its invalidity is asserted on the ground that no map of the entire general route to the Pacific, but only of that portion extending to the western boundary of Minnesota, had been filed, and the case of *Railroad Co.* v. *Herring,* 110 U. S. 27; S. C. 3 Sup. Ct. Rep. 485, is cited. I do not think that case in point, or the reason sufficient. In that case the contest was between the railroad company and parties making private entries of lands within the indemnity limits. No withdrawal had in fact been made; and only a map of part of the route filed. The court held that no right of selection of indemnity lands accrued until the amount to be selected had been ascertained by the definite location of the entire route; that the filing of a partial map did not operate as a withdrawal, or compel a withdrawal, and, there having been no withdrawal, the right of private entry was undisturbed. I do not understand it to deny the power of withdrawal or its effect if made. It surely is no reversal of prior decisions in respect to withdrawals. The matter of withdrawals was fully considered in the *Des Moines River Grant Cases. Wolcott* v. *Des Moines Co.,* 5 Wall. 681; *Williams* v. *Baker,* 17 Wall. 144; *Homestead Co.* v. *Railroad Co.,* Id. 153; *Wolsey* v. *Chapman,* 101 U. S. 755; *Dubuque R. Co.* v. *Des Moines R. Co.,* 109 U. S. 329; S. C. 3 Sup. Ct. Rep. 188.

The grant in those cases was as follows:

"For the purpose of aiding said territory to improve the navigation of the Des Moines river from its mouth to the Raccoon Fork, so called, in said territory, one equal moiety, in alternate sections, of the public lands, in a strip five miles in width, on each side of said river."

No withdrawal was in terms authorized, yet a withdrawal was in fact made extending not merely to the Raccoon Fork, but above it, to the northern boundary of the territory. The supreme court held that the grant only extended to the Raccoon Fork, but sustained the validity of the entire withdrawal. In 5 Wall. *supra,* the court said:

"It has been argued that these lands had not been reserved by competent authority, and hence that the reservation was nugatory. As we have seen, they were reserved from sale for the special purpose of aiding in the improvement of the Des Moines river, first, by the secretary of the treasury, when the land department was under his supervision and control, and again by the secretary of the interior after the establishment of this department, to which the duties were assigned, and afterwards continued by this department under instructions from the president and cabinet. Besides, if this power was not competent, which we think it was ever since the establishment of the land department, and which has been exercised down to the present time, the grant of eighth of August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the land-office to reserve from sale the lands embraced in the grant; otherwise its object might be utterly defeated. Hence, immediately upon a grant being made by congress, for any of these public purposes, to a state, notice is given by the commissioner of the land-office to the registers and receivers to stop all sales, either public or by private entry. Such notice was given the same day the grant was made, in 1856, for the benefit of these railroads."

And also, in the same case, it was held that a railroad grant of like import with that in question here was not operative within the limits of the withdrawal.

Again, the extent of the withdrawal is challenged. While no express direction or withdrawal is found in the Northern Pacific act, yet its language contemplates a withdrawal, but only from "sale, entry, and pre-emption," and therefore impliedly forbids a withdrawal for any other purpose, and the case of *Kansas Pac. Ry. Co.* v. *Dunmeyer*, 113 U. S. 629, S. C. 5 Sup. Ct. Rep. 566, is cited as authority. That case decides that where an act directs the secretary of the interior, upon the filing of a map of general route, to withdraw certain lands from "sale," the filing of the map has no further force than to carry into effect the law, and does not operate as a withdrawal from homestead and pre-emption. *Expressio unius est exclusio alterius* was invoked. But here there was no express direction of withdrawal. The general powers of the land department were not limited. The withdrawal was in fact made. It was in existence and a public record in the offices at Washington at the time the act of 1871 was passed. Congress may be presumed to have acted with knowledge of this fact. If it had intended to stamp with the seal of disapprobation this act of the land department as a usurpation of authority, it could easily have expressed that intent in clear and unmistakable terms. On the contrary, its language seems rather an approval of the action of that department, and to make a grant subject to the reservations created thereby. I can come to no other conclusion than that the withdrawal was valid, and that the grant to the St. Paul & Pacific never had operative force within its limits.

The only remaining lands are those outside these withdrawal limits, but within the indemnity limits of the Northern Pacific. As to them but a word is necessary. No rights are acquired until selection. *Ryan* v. *Railroad Co.*, 99 U. S. 382; *Grinnell* v. *Railroad Co.*,

103 U. S. 739. No prior selection on the part of the Northern Pacific is shown. Its claim that, as the holder of the prior grant, it has a reasonable time in which to make a selection, if good in law, which I doubt, is not sustained by the facts.

A decree will therefore be entered in favor of the Northern Pacific Company as to all lands within its place limits, and also within the limits of the withdrawal of October 12, 1870, and dismissing the supplemental bill of the St. Paul, Minneapolis & Manitoba Railway Company at its costs. The case will be referred to a master to report the lands coming within the limits named.