## HEWITT *v.* SCHULTZ.

ERROR TO THE SUPREME COURT OF THE STATE OF NORTH DAKOTA.

No. 34. Argued October 15, 16, 1900.—Decided January 7, 1901.

The controlling question in this case is whether it was competent for the Secretary of the Interior upon receiving and approving of the map of the definite location of the Northern Pacific Railroad to make the order of withdrawal, stated by the court in its opinion, in respect of the odd-numbered sections of land within the indemnity limits, that is, of lands between the forty mile and fifty mile limits. In 1888 Secretary Vilas, in an elaborate opinion, held that the Northern Pacific act forbade the Land Department to withdraw from the operation of the preëmption and homestead laws, any lands within the indemnity limits of the grant made by the act of July 2, 1864, 13 Stat. 365, c. 217; and that, until a valid selection by the grantee was made from the lands within the indemnity limits, they were entirely open to disposition by the United States, or to appropriation under the laws of the United States for the disposition of the public lands. *Held,* that the question could not be said to be free from doubt, but that it was the settled doctrine of the court that in case of ambiguity the Judicial Department will lean in favor of a construction given to a statute by the Department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties, who have contracted with the Government upon the faith of such construction, may be prejudiced.

If the question whether there has been deficiency in the grant of lands to the Northern Pacific Railroad Company was at all material in this case, no effect can be given to the certificate of Commissioner Lamoreux set out in the findings of fact.

THE case is stated in the opinion of the court.

*Mr. J. H. McGowan* for plaintiff in error. *Mr. James A. Kellogg* and *Mr. C. D Austin* were on his brief.

*Mr. C. W. Bunn* and *Mr. James B. Kerr* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action is in the nature of ejectment. It was brought to recover the possession of the northeast quarter of section thir-

teen, township one hundred and thirty-two north of range fifty-seven west of the fifth principal meridian, situated in the county of Sargent, North Dakota, and of which the plaintiff Hewitt, now plaintiff in error, claimed to be the owner in fee in virtue of a patent issued to him by the United States.

The present defendants in error, who were defendants below, claimed title as purchasers from the Northern Pacific Railroad Company, which asserted ownership of the land in virtue of the act of Congress of July 2, 1864, granting public lands to that corporation to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route.    13 Stat. 365, c. 217.

There was a verdict and judgment in the court of original jurisdiction in favor of the plaintiff.    But that judgment was reversed in the Supreme Court of North Dakota, and the cause was remanded with directions to dismiss the action.    7 North Dakota, 601.

This appeal questions the final judgment of the highest court of North Dakota upon the ground that it denied to Hewitt rights and privileges specially set up and claimed by him under the laws of the United States.

The record contains a voluminous finding of facts based upon the stipulation of the parties.    In the view taken of the case by this court many of those facts are immaterial.    The precise case to be determined is shown by the following statement, based upon the finding of facts:

On the 30th day of March, 1872, the railroad company having by a map designated its *general* route from the Red River of the North to the Missouri River in the then Territory of Dakota, an Acting Commissioner of the General Land Office transmitted to the register and receiver of the proper local office a diagram showing such route, and in conformity with instructions from the Secretary of the Interior, directed them "to withhold from sale or location, preëmption or homestead entry all the surveyed or unsurveyed odd-numbered sections of public lands falling within the limits of forty miles" (the place or granted limits) as designated on such map.    This order took effect April 22, 1872, on which day it was received at the local land office.

The land in dispute is coterminous with the general route of the railroad as indicated by the above map.

On the 11th day of June, 1873, the railroad company having previously filed a map of the *definite* location of its line from the Red River of the North to the Missouri River in Dakota Territory, the General Land Office transmitted to the local land office a diagram showing the forty and fifty mile limits of the land grant along that line, and that office was directed " to withhold from sale or entry all the odd-numbered sections, both surveyed or unsurveyed, falling within those limits, and to hold subject to preëmption and homestead entry only the even-num- bered sections at $2.50 per acre within the forty-mile limits, and $1.25 per acre between the forty and fifty-mile or indem- nity limits." This order was recorded at the local land office June 24, 1873.

The land in dispute, the finding of facts states, was cotermi- nous with such line of definite location, was more than forty but within fifty miles of such line, that is, was within the in- demnity limits, and was at the date of such location public lands to which the United States had full title, not reserved, sold, granted or otherwise appropriated, free from preëmption or other claims or rights, and non-mineral in character.

It may be here observed that the controlling question in this case is whether it was competent for the Secretary of the In- terior, upon receiving and approving the map of the definite location of the road, to make the above order of withdrawal in respect of the odd-numbered sections of land within the *indem- nity* limits, that is, of lands between the forty-mile and fifty- mile limits. This question will be adverted to after we shall have stated other facts material in the case.

On or about the 10th day of April, 1882—the railroad com- pany not having at that time made or attempted to make any selection of lands in the indemnity limits to supply losses in the place limits—Hewitt, being qualified to acquire and hold lands under the preëmption laws of the United States, settled upon and improved the lands here in dispute with the intention of entering the same under the provisions of the act of Congress approved September 4, 1841, 5 Stat. 453, c. 16, and the acts sup-

plemental thereto and amendatory thereof, authorizing the entry and purchase of public lands by citizens of the United States and by those who declared their intention to become citizens.

The township embracing the land in dispute was surveyed in July, 1882, and the plat of survey was filed in the local land office on the 13th day of October of the same year.

On the 2d day of November, 1882, Hewitt presented to the proper United States local land office a declaratory statement for this land, as provided by law, which was received, filed and placed upon the records of that office.

On the 19th day of March, 1883, the railroad company filed in the local land office a list of selections of land "in bulk" embracing the land in dispute, which, as already stated, was within the indemnity limits of the railroad company.

Having from the day of his settlement upon the land until April 4, 1883, resided upon and cultivated the same as required by law, Hewitt, on the day last named, submitted his final proofs for the land, and duly tendered to the local land office the Government's price for it, together with all required fees. But such final proof was rejected, the reason assigned for such rejection being that the land had been withdrawn from entry under the act of July 2, 1864, granting lands to the Northern Pacific Railroad Company, and the acts of Congress supplemental thereto and amendatory thereof. From that decision Hewitt appealed to the Commissioner of the General Land Office, and on the 5th of October, 1883, that officer affirmed the decision of the local land office.

On the 21st of June, 1884, while Hewitt was in possession—he had been in actual possession since April 10, 1882, and had made valuable improvements on the land—the defendant Emil Schultz (his co-defendant being his wife) made a contract with the railroad company, by which the latter agreed, in consideration of $1200, to sell and convey to the former the land in dispute. Thereupon Schultz entered upon the land, ousting Hewitt from actual possession, and taking up his residence thereon, and cultivating the same. Schultz having paid the above consideration, the railroad company conveyed the land to him. But the conveyance was not made until December 18, 1889.

Before that conveyance was made, namely, on the 15th day of August, 1887, the Secretary of the Interior revoked the above order withdrawing the odd-numbered sections of the indemnity lands from sale or entry.

Subsequently, October 12, 1887, the railroad company filed in the local land office a list designating an amount of lands equal to those "selected" in the list of March 19, 1883, as having been lost and excepted from the grant and within its place lands as defined on the map of definite location.

Of the decision of the Commissioner of the General Land Office on the 5th day of October, 1883, Hewitt had no notice whatever until on or about August 1, 1888. On the latter day he applied for a review by the Commissioner. That review was had with the result that the decision of the local land office against Hewitt was reversed and set aside, his final proofs were admitted, and the selection by the railroad was held for cancellation.

In his opinion delivered September 25, 1888, the Commissioner said: "Said tract is within the 50-mile indemnity limit of the withdrawal for the benefit of the Northern Pacific R. R. Co., ordered by letter from this office, dated June 11th, 1873, received at the local land office then at Pembina, June 24th, 1873. The township was surveyed July 12th to 27th, 1882, and the plat of survey was filed in your office on the 13th day of October following; the whole of said section was selected by the agent of the railroad company March 19th, 1883, per list No. 6. . . . The final proof submitted by applicant shows that he is a native born citizen, over 21 years of age, and a qualified preëmptor, July 10th, 1882; his improvements consisted of a frame house, 16×16 feet, stable 10×12 feet, and 20 acres of ground broken, the value of the same being estimated at $350. This declaratory statement was presented for filing within the time prescribed by law and was accepted by your office, a receipt issuing therefor. Under the late decision of the Hon. Secretary of the Interior in the case of the *Northern Pacific Railroad Company* v. *Guilford Miller*, 7 L. D. 100, it is held that the withdrawal of the indemnity lands for the benefit of said company was prohibited by the sixth section of the granting act, and,

being in violation of law and without effect, was not operative to defeat the rights of *bona fide* adverse claimants under the general laws of the United States who settled on lands within such limits prior to the time when selection by the railroad had been made. In view of the fact that claimant established his actual residence and had permanent improvements upon the land prior to the Government survey or selection by the railroad company, his claim was superior thereto, and hence office decision of October 5th, 1883, is set aside, Hewitt's final proof admitted, and the selection by the railroad company held for cancellation."

The next step was the filing by the railroad company on the 23d day of February, 1892, of a rearranged list of selections— "tract for tract" selection—selecting the tract in dispute for one previously selected in Wisconsin but which was lost to the company.

The railroad company having appealed from the decision of September 25, 1888, in favor of Hewitt, the Secretary of the Interior by a decision rendered August 11, 1894, sustained Hewitt's right to the land. The Secretary, addressing the Commissioner of the General Land Office, said : " I have considered the appeal of the Northern Pacific R. R. Co., from your office decision of September 25th, 1888, holding for cancellation its indemnity selection of the N. E. $\frac{1}{4}$, sec. 13, T. 132 N., R. 57 W., Fargo., North Dikota, on account of the prior claim of Fred. Hewitt under his preëmption filing upon which he has submitted proof. Your office decision is based upon the holding that prior to selection lands within said limits are subject to appropriation as other public lands, which is in harmony with the recent decisions of this Department in the case of *Jennie L. Davis* v. *Northern Pacific R. R. Co.*, 19 L. D. 87, and your office decision is therefore affirmed and the company's selection will be cancelled."

In conformity with the decision of the Secretary of the Interior, and based upon the final preëmption proof made by Hewitt, a patent of the United States was issued to him on the 22d day of June, 1895.

We have seen from the above statement that upon the filing

and acceptance of the map of the definite location of the line of the Northern Pacific Railroad, the Land Office withdrew from sale or entry all the odd-numbered sections, surveyed and unsurveyed, within both the place and indemnity limits. Was it competent for the Secretary of the Interior, immediately upon the acceptance of the map of definite location, to include in his withdrawal from sale or entry lands within the indemnity limits? Was he invested with any such authority by the act of July 2, 1864, 13 Stat. 365, c. 217? Did Congress intend, by that act, to declare that when the railroad company indicated its line of definite location the odd-numbered sections outside of the forty-mile limit and within the fifty-mile limit, on each side of such line, along the whole of the line thus located, should not be subject to the preëmption and homestead laws until it was finally ascertained whether the railroad company was entitled by reason of the loss of lands within the place or granted limits to go into the indemnity limits in order to obtain lands to meet such loss? An answer to these questions may be found in the act of July 2, 1864, as interpreted by the Land Department for many years past. We will now advert to such of the provisions of that act as are pertinent to the present inquiry.

By the third section of the act Congress granted to the Northern Pacific Railroad Company "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate

sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections : . . . *Provided, further*, That all mineral lands be, and the same are hereby, excluded from the operation of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest to the line of said road may be selected as above provided. . . ."

This section has been often under examination by this court, and in repeated decisions it has been held that the act of Congress "*granted* to the Northern Pacific Railroad Company *only* public lands to which the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claim or rights *at the time its line of road was definitely fixed,* and a plat thereof filed in the office of the Commissioner of the General Land Office "—lands that were not, at that time, free from preëmption or other claims or rights being excluded from the grant. *United States* v. *Northern Pacific Railroad,* 152 U. S. 284, 296 ; *Northern Pacific Railroad* v. *Sanders,* 166 U. S. 620, 634, 635, and *United States* v. *Oregon & California Railroad,* 176 U. S. 28, 42, and authorities cited in each case. The cases all speak of the granted lands as those within the place limits.

The fourth section of the act provided : " That whenever said 'Northern Pacific Railroad Company' shall have twenty-five consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated, the President of the United States shall appoint three commissioners to examine the same, and if it shall appear that twenty-five consecutive miles of said road and telegraph line have been completed in a good, substantial and workmanlike manner, as in all other respects required by this act, the commissioners shall so report to the President of the United States, and patents of lands, as aforesaid, shall be issued to said company, confirming to said company the right and title to said lands, situated opposite to, and coterminous with, said completed section of said road ; and, from time to time, whenever twenty-five additional consecutive miles shall have been constructed, completed and in readiness as aforesaid, and verified by said commissioners to the President of the

United States, then patents shall be issued to said company conveying the additional sections of land as aforesaid: . . . . *Provided*, That not more than ten sections of land per mile, as said road shall be completed, shall be conveyed to said company for all that part of said railroad lying east of the western boundary of the State of Minnesota, until the whole of said railroad shall be finished and in good running order, as a first-class railroad, from the place of beginning on Lake Superior to the western boundary of Minnesota: *Provided, also,* That lands shall not be granted under the provisions of this act on account of any railroad, or part thereof, constructed at the date of the passage of this act."

But so far as the present case is concerned the most material section of the act is the sixth. That section provided: "That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land *hereby granted* shall not be liable to sale, or entry, or preëmption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, 1841, [5 Stat. 453, c. 16,] granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, [12 Stat. 392, c. 75,] *shall be, and the same are hereby,* extended to *all other lands* on the line of said road, when surveyed, excepting those *hereby granted* to said company. And the reserved alternate sections shall not be sold by the Government at a price less than two dollars and fifty cents per acre, when offered for sale."

It is contended that, construing the third and sixth sections together, it is clear that the words, "the odd sections of land hereby granted" in the first part, and the words, "excepting those hereby granted to said company," in the latter part of the sixth section refer to the lands described in the first section of the act—that is, to the odd-numbered sections in the place limits which were free from preëmption or other claims or rights, and had not been appropriated by the United States

prior to the definite location of the road; that as to "all other lands on the line of the said road, when surveyed," the act expressly declares that the provisions of the preëmption act of 1841 and the acts amendatory thereof, and of the homestead act of 1862, should extend to them; that Congress took pains to declare that it did not exclude from the operation of those statutes any lands except those granted to the company in the place limits of the road which were unappropriated when the line of the railroad was definitely fixed; and that if at the time such line was "definitely fixed," it appeared that any of the lands granted, that is, lands in the place limits, had been sold, granted or otherwise appropriated, then, but not before, the company was entitled to go into the indemnity limits beyond the forty-mile and within the fifty-mile line, and under the direction of the Secretary of the Interior, and not otherwise, select odd-numbered sections to the extent necessary to supply the loss in the place limits. It is also contended that the object of the reference in the sixth section of the Northern Pacific act to the preëmption and homestead acts could only have been to bring the odd-numbered sections in the indemnity limits within the operation of those acts.

This construction of the act of July 2, 1864, finds support in legislation enacted subsequently and before the railroad company filed its map of general route. By a joint resolution approved May 31, 1870, Congress declared : " That the Northern Pacific Railroad Company be, and hereby is, authorized . . . also to locate and construct, under the provisions and with the privileges, grants and duties provided for in its act of incorporation, its main road to some point on Puget Sound, *via* the valley of the Columbia River, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound ; and in the event of there not being in any State or Territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land be-

longing to the United States, and designated by odd numbers, in such State or Territory, within ten miles on each side of said road, *beyond the limits prescribed in said charter*, as will make up such deficiency, on said main line or branch, except mineral ·and other lands as excepted in the charter of said company of 1864, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, preëmpted, or otherwise disposed of subsequent to the passage of the act of July 2, 1864. . . ." 16 Stat. 378.

Thus, it seems, a second indemnity limit was established into which the company could go and obtain lands in lieu of lands lost to it in the granted or place limits.

We do not find from the published decisions of the Land Department that the question of the power of the Secretary of the Interior, simply upon the definite location of the Northern Pacific Railroad, to withdraw from the operation of the preemption and homestead laws lands within the indemnity limits, was ever distinctly presented and disposed of prior to the year 1888. It was mooted in the case of the *Atlantic and Pacific Railroad Company*, reported in 6 L. D. 84, 87. The third and sixth sections of the charter of that company were the same as the third and sixth sections, above quoted, of the charter of the Northern Pacific · Railroad Company. From the opinion of Secretary Lamar in that case, we infer that some of his predecessors had assumed that the power to withdraw lands in indemnity limits from sale or entry could be exercised upon the definite location of the railroad even before it had been ascertained by losses in place limits that the company must look to the indemnity limits in order to supply its grant. The Secretary said: " Were I called upon to treat as an original proposition the. question as to the legal authority of the Secretary to withdraw from the operation of the settlement laws lands within the indemnity limits of said grant, I should at least have such doubts of the existence of any such authority as to have restrained me of its exercise. It would seem that the very words of the act, 'the odd-numbered sections ·of land hereby granted shall not be liable to sale or entry or preëmption before or after they are surveyed, except by said company, as pro-

vided in this act,' of themselves indicate most clearly the legis-
lative will that there should not be withdrawn for the benefit
of said company from sale or entry any other lands, except the
odd-numbered sections within the granted limits, as expressly
designated in the act.   But when the provision following this,
in the very same sentence, is considered—' but the provisions of
the act of September,. 1841, granting preëmption rights, and
the acts amendatory thereof, and of the act entitled " An act to
secure homesteads to actual settlers upon the public domain,"
approved May 20, 1862, *shall be* and the same are hereby ex-
tended to all other lands on the line of said road when surveyed,
excepting those hereby granted to said company '—it is difficult
to resist the conclusion that Congress intended that ' all other
lands excepting those hereby granted to said company ' shall
be open to settlement under the preëmption and homestead
laws, and to prohibit the exercise of any discretion in the ex-
ecutive in the matter of determining what lands shall or shall
not be withdrawn.    Waiving all questions as to whether or not
said granting act took from the Secretary all authority to with-
draw said indemnity limits from settlement, it is manifest that
the said act gave no special authority or direction to the exec-
utive to withdraw said lands ; and when such withdrawal was
made it was done by virtue of the general authority over such
matters possessed by the Secretary of the Interior, and in the
exercise of his discretion ; so that, were the withdrawal to be
revoked, no law would be violated, no contract broken.   The
company would be placed exactly in the position which the law
gave it, and deprived of no rights acquired thereunder.    It
would yet have its right to select indemnity for lost lands, but
in so doing it would have no advantage over the settler, as it
now has in contravention of the policy of the Government in
denial of the rights unquestionably conferred upon settlers by
land laws of the country, apparently specially protected by the
provisions of the granting act under consideration."

But in 1888 the question was directly presented to Secretary
Vilas in *Northern Pacific Railroad Company* v. *Miller*, 7 L. D.
100, 120, (referred to in the decision of the Commissioner of the
General Land Office of September 25, 1888, upholding Hewitt's

claim,) and it was there held, in an elaborate opinion, that the Northern Pacific act forbade the Land Department to with-draw from the operation of the preëmption and homestead laws any lands within the indemnity limits of the grant made by the act of July 2, 1864.   The Secretary said :

" In my opinion, and it is with great deference that I present it, the granting act not only did. not authorize a withdrawal of lands in the indemnity limits, but forbade it.   The difference between lands in the granted limits, and lands in indemnity limits, and between the time and manner in which the title of the United States changes to and vests in the grantee, accord-ingly as lands are within one or the other of these limits, has been clearly defined by the Supreme Court, and it is sufficient to state the well settled rules upon this subject.

" As to the lands in the primary, or granted, limits : ' The title to the alternate sections to be taken within the limits, when all the odd sections are granted, becomes fixed, ascertained and perfected in each case by this location of the line of road, and in case of each road the title relates back to the act of Congress.' *St. Paul, Sioux City &c. Railroad* v. *Winona &c. Railroad,* 112 U. S. 720, 726 ; *Missouri, Kansas & Texas Railway* v. *Kan-sas Pacific Railway,* 97 U. S. 491, 501 ; *Van Wyck* v. *Knevals,* 106 U. S. 360 ; *Cedar Rapids & Missouri Railroad Co.* v. *Her-ring,* 110 U. S. 27 ; *Grinnell* v. *Railroad Co.,* 103 U. S. 739.   As to indemnity limits : ' The time when the right to lands becomes vested, which are to be selected within given limits under these land grants, whether the selection is in lieu of lands deficient within the primary limits of the grant, or of lands which for other reasons are to be selected within certain secondary limits, is different in regard to those that are ascertained within the pri-mary limits by the location of the line of the road.   In *Ryan* v. *Railroad Co.,* 99 U. S. 382, this court, speaking of a contest for lands of this class, said : " It was within the secondary or indemnity territory where that deficiency was to be supplied. The railroad company had not and could not have any claim to it until specially selected, as it was for that purpose ;" and the reason given for that is that " when the road was located and the maps were made the right of the company to the odd

sections first named became fixed and absolute. With respect
to the lieu lands, as they are called, the right was only a float,
and attached to no specified tracts until the selection was ac-
tually made in the manner prescribed." The same idea is sug-
gested, though not positively affirmed, in the case of *Grinnell*
v. *Railroad Co.*, 103 U. S. 739. In the case of *Cedar Rapids
Railroad Co.* v. *Herring,* 110 U. S. 27, this principle became
the foundation, after much consideration, of the judgment of
the court rendered at the last term. And the same principle
is announced at this term in the case of the *Kansas Pacific Rail-
road Co.* v. *Atchison, Topeka and Santa Fé Co., ante,* (112 U. S.)
414. The reason for this is that, as no vested right can attach to
the lands in place—the odd-numbered sections within six miles
of each side of the road—until these sections are ascertained
and identified by a legal location of the line of the road, so in
regard to the lands to be selected within a still larger limit, their
identification cannot be known until the selection is made. It
may be a long time after the line of the road is located before
it is ascertained how many sections, or parts of sections, within
the primary limits have been lost by sale or preëmption. It
may be still longer before a selection is made to supply this
loss.' *St. Paul Railway* v. *Winona Railway Co.,* 112 U. S.
720, 731.

"The consequence of this difference is that until a valid se-
lection by the grantee is made from the lands within the indem-
nity limits, they are entirely open to disposition by the United
States or to appropriation under the laws of the United States
for the disposition of the public lands. There is nothing to the
line bounding the indemnity limits to distinguish lands within
it from any other public lands; the only purpose of that being
to place a boundary upon the right of selection in the grantee
to make good losses sustained within granted limits. This ef-
fect has been most explicitly declared by the Supreme Court
in the case of *Kansas Pacific Railroad* v. *Atchison, Topeka
and Santa Fé Railroad,* 112 U. S. 414, and in other cases. In
that case, the court said of an order of the Commissioner of the
General Land Office similar to this, so far as applicable to in-
demnity limits: 'The order of withdrawal of lands along the

probable lines of the defendant's road made on the 9th of March, 1863, by the Commissioner of the General Land Office, affected no rights which without it would have been acquired to the land, nor in any respect controlled the subsequent grant.' It also said of the indemnity limits under discussion there : ' For what was thus excepted from the granted limits other lands were to be selected from adjacent lands, *if any then remained, to which no other valid claim had originated.* But what unappropriated lands would thus be found and selected could not be known before actual selection. A right to select them within certain limits, in case of deficiency within the ten mile limit, was alone conferred, not a right to any specific land or lands capable of identification by any principles of law or rules of measurement. Neither locality nor quantity is given from which such lands could be ascertained. If, therefore, when such selection was to be made the lands from which the deficiency was to be supplied had been appropriated by Congress to other purposes, the right of selection became a barren right, for until selection was made the title remained in the Government, subject to its disposal at its pleasure.'

"It was in view of this difference and its consequences that the language of the granting act was employed by Congress, by which it was explicitly provided that the provisions of the preëmption and homestead laws ' shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company.' If lands within the indemnity limits are to be regarded as ' on the line of said road,' this declaration appears to me prohibitory of any withdrawal, for the benefit of this road. It might be that such lands could be withdrawn for some other public purpose, within executive authority to provide for, such, for example, as to constitute a reservation for Indians. But this language was introduced into the same section which declared the granted lands not to be liable to sale, etc., and immediately following that declaration, and in the same sentence, so as obviously to mark the legislative intent to make clearly distinguishable the lands beyond the granted limits as being liable to disposition under those laws. Having so explicitly de-

clared, it was not necessary to add a prohibition upon executive officers against withdrawal for the benefit of the road. It gave to any person entitled under the preëmption or homestead laws to take any such lands, the absolute right to acquire any proper quantity thereof, in accordance therewith; and this right an executive officer could not deprive the settler of. The act as much makes that his right, as it makes it the right of the company to take the others.

"I cannot be satisfied with the idea that this language was so introduced in immediate qualification of and distinction upon the words rendering lands in the granted limits 'not liable to sale or entry' for the mere purpose of declaring 'what was already enacted by general laws.' The general laws applied without this declaration, and they applied more extensively than this would apply them, since by the general laws entries of other kinds might, if conditions concurred, be also made. The aim of this language was, as I am forced to read it, towards the availability to settlement of all lands not granted. It was a vast grant, and even as so limited, a threatening shadow to fall on the settlement of the Northwest. Well might Congress say, 'The lands granted you shall have, but you shall tie up no more from the actual settler to the prevention of development.'

"It may be claimed that the words, 'all other lands on the line of said road,' do not embrace lands within the indemnity limits. That construction would seem still more to deny the Commissioner's power to withdraw them; since it cannot be supposed Congress intended him to withdraw lands not on the line of the road. But the phrase immediately after employed in the section—'the reserved alternate sections'—when speaking of the lands to which the double minimum price must be attached, seems to indicate clearly that Congress had, in the use of the power, a more comprehensive meaning than simply to include by it the lands of the even-numbered sections within the granted limits.

"The Supreme Court appears to have fairly set the question at rest in the case of *United States* v. *Burlington &c., Railroad Co.*, 98 U. S. 334, 339, where it is said of the similar point raised in respect to the line then under consideration : 'And the land

was taken along such line in the sense of the statute, when taken along the general direction or course of the road within lines perpendicular to it at each end. The same terms are used in the grant to the Union Pacific Company, in which the lateral limit is twenty miles; and if a section at that distance from the road can be said to be along its line, it is difficult to give any other meaning than this to the language. They certainly do not require the land to be contiguous to the road; and if not contiguous, it is not easy to say at what distance the land to be selected would cease to be along its line.'

" The general rule alluded to in the opinion that lands once properly withdrawn by executive order remain so until restored to market by like order or by statute is not questioned. But every such general rule yields to the will of the legislature in a particular case; and the considerations presented are designed to show the grounds of my opinion that the legislation is in this case particular and exhaustive."

The same question arose in *Northern Pacific Railroad v. Davis*, 19 L. D. 87, 90, and Secretary Smith expressed his concurrence in the views announced by Secretaries Lamar and Vilas. Referring to certain passages in the opinion of Secretary Vilas, he said: " These views alone would be sufficient, in my judgment, to sustain the conclusion reached in this case, but I am not left to stand upon them only, for Congress in the same section has gone further. Not content with ordering a withdrawal, that body expressly declared a prohibition against the making of any other withdrawal, when it said, in the next clause of the same sentence, that the provisions of the preëmption and homestead laws 'shall be, and hereby are, extended to all other lands on the line of the said road when surveyed excepting those hereby granted to said company.' Here is an enactment in which the most comprehensive language is used. Having withdrawn the granted sections, 'all other' lands within the grant, along the line of the road, are being legislated for. It would seem, therefore, to follow logically, when it was commanded that the preëmption and homestead laws be extended to 'all other lands,' it was all those lands within the limits of the grant which had not been otherwise disposed of by the act. The

'other' lands within the limits of the grant were the reserved sections and the odd and even sections within the indemnity limits, and it is clear to my mind that Congress meant all of those lands, for 'all' other lands surely cannot mean only a portion of the other lands. *Qui omne dicit, nihil excludit* is a maxim well recognized in the construction of statutes and is applicable here. This aspect of the case is presented and fully discussed by Mr. Secretary Vilas in the *Guilford Miller* case, and concurring in his reasoning, it is not necessary that there should be further elaboration of the argument. The views which I have herein expressed were entertained also by Mr. Secretary Lamar, and are clearly and tersely stated by him in his opinion, before quoted from, in the case of the *Atlantic and Pacific Railroad*, in 6 L. D. p. 87."

It was admitted at the hearing that the construction of the Northern Pacific act of 1864 announced by Secretary Vilas had been adhered to in the administration of the public lands by the Land Department. We are now asked to overthrow that construction by holding that it was competent for the Land Department, immediately upon the definite location of the line of the railroad, to withdraw from the settlement laws all the odd-numbered sections within the indemnity limits as defined by the act of Congress. If this were done it is to be apprehended that great if not endless confusion would ensue in the administration of the public lands, and that the rights of a vast number of people who have acquired homes under the preëmption and homestead laws, in reliance upon the ruling of Secretary Vilas and his successors in office, would be destroyed. Of course, if the ruling of that office was plainly erroneous, it would be the duty of the court to give effect to the will of Congress; for it is the settled doctrine of this court that the practice of a department in the execution of a statute is material only when doubt exists as to its true construction.

But without considering the matter as if it were for the first time presented, it is sufficient to say that the question before us cannot be said to be free from doubt. The intention of Congress has not been so clearly expressed as to exclude construction or argument in support of the view taken by Secretaries

Lamar, Vilas and Smith, and upon which the Land Department has acted since 1888. "It is the settled doctrine of this court," as was said in *United States* v. *Alabama Great Southern Railroad*, 142 U. S. 615, 621, "that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the Government upon the faith of such construction may be prejudiced." These observations apply to the case now before us, and lead to the conclusion that if the practice in the Land Department could with reason be held to have been wrong, it cannot be said to have been so plainly or palpably wrong as to justify the court, after the lapse of so many years, in adjudging that it had misconstrued the act of July 2, 1864. The order of withdrawal by the Secretary of the Interior, upon which the title of the railroad company depends, being out of the way, there is no legal ground to question the title of the plaintiff to the land in dispute.

It is appropriate to refer to one other matter. It appears from the finding of facts that Mr. Lamoreux, when Commissioner of the General Land Office, issued a certificate, dated May 2, 1896, in which it was stated: "I have caused examination to be made of the records of this office relative to the grant to the Northern Pacific Railroad Company under acts of Congress approved July 2, 1864, and May 31, 1870, and certify that said records show that the total area of lands excepted from and lost to said grant within its primary limits amounts to 10,624,746.27 acres, and that there are within the first indemnity limits not to exceed 7,065,523.49 acres which are, or will be when surveyed, available for selection to satisfy the losses above referred to, thus leaving a known deficiency of 3,559,222.78 acres in said grant which cannot be satisfied from the limits as now recognized by this office."

It does not appear from the finding of facts that this certificate was given in any proceeding pending between parties in the Land Department. On the contrary, the Commissioner of

the General Land Office in a supplemental report for the year 1899 referred to the grant to the Northern Pacific Railroad Company, and said: "In view of the large quantities of unsurveyed lands within the grant, and of the uncertainty of their availability for use in the satisfaction of it; of the litigation pending involving lands within the conflicting limits aforesaid and the true eastern terminus of the grant, and considering the proceedings now in progress under the act of July 1, 1898, and the right of selection for lands within the Mount Ranier forest reserve under the act of March 2, 1899, and the prospect of the creation of other forest reserves within the limits of the grant, I am of opinion that it cannot at this time be stated with any degree of certainty that there are or are not sufficient lands available to satisfy the Northern Pacific grant under the act of 1864." Besides, in *Northern Pacific Railroad Co.*, 25 L. D. 511, and in *Northern Pacific Railroad Co.* v. *Streib*, 26 L. D. 589, it was found that there never had been any ascertained deficiency in the grant to the Northern Pacific Railroad Company. In the above case in 26 L. D. the Secretary of the Interior, refering to the certificate of Commissioner Lamoreux, said: "Relative to the certification of a deficiency in the grant to this company [the Northern Pacific] made by your predecessor, it is sufficient to say that this department has never given recognition to that certificate, nor has the company been relieved from the specification of losses in making indemnity selections on account of an ascertained deficiency in the grant." So that if the question whether there has been deficiency in the grant of lands to the Northern Pacific Railroad Company was at all material in the present case, no effect can be given to the certificate of Commissioner Lamoreux set out in the findings of fact.

*In our opinion the plaintiff Hewitt was entitled to a judgment upon the facts found; and the judgment of the Supreme Court of the State reversing the judgment of the court of original jurisdiction and directing the dismissal of the action is itself reversed, and the cause is remanded for further proceedings consistent with this opinion.*

MR. JUSTICE WHITE concurred in the result.

MR. JUSTICE BREWER (with whom MR. JUSTICE SHIRAS concurred), dissenting :

I am unable to concur in the opinion and judgment just announced, and will state briefly the ground for my dissent.

From the beginning of land grants the Land Department has exercised the power of withdrawing from preëmption and homestead entry any body of lands which in its judgment might be necessary for the satisfaction of the grant. And the existence of this power has been affirmed by this court in many cases, and without a single exception up to the present decision. The grant for the improvement of the Des Moines River terminated, as finally decided, at the Raccoon Fork of that river, about half way between the northern and southern boundary of the State of Iowa, yet a withdrawal of lands along that river above that fork, and up to the northern boundary of the State, was sustained. *Wolcott* v. *Des Moines Company,* 5 Wall. 681; *Wolsey* v. *Chapman,* 101 U. S. 755. It was held that as the extent of the grant was doubtful, it was within the power of the Land Department and also proper for it to withdraw from settlement and sale all lands that might under any construction of the grant be needed to satisfy it. See among other cases sustaining this power of withdrawal: *Homestead Company* v. *Valley Railroad,* 17 Wall. 153; *Williams* v. *Baker,* 17 Wall. 144; *Dubuque & Sioux City Railroad* v. *Des Moines Valley Railroad,* 109 U. S. 329, 332, 333; *Bullard* v. *Des Moines Railroad,* 122 U. S. 167, 170, 171, 176; *United States* v. *Des Moines Navigation &c. Co.,* 142 U. S. 510, 528; *Hamblin* v. *Western Land Co.,* 147 U. S. 531, 536; *Riley* v. *Welles,* 154 U. S. 578; *Wood* v. *Beach,* 156 U. S. 548; *Wisconsin Central Rd. Co.* v. *Forsythe,* 159 U. S. 46, 54, 57; *Spencer* v. *McDougal,* 159 U. S. 62, 64; *Northern Pacific Railroad* v. *Musser-Sauntry Co.,* 168 U. S. 604, 607.

It is to be assumed that when Congress makes a grant of a certain number of sections per mile it intends that its grantee shall obtain that number of sections. And when it provides that, if there be not within the place limits the requisite num-

ber of sections free from homestead or preëmption entry, the grantee may go into an indemnity limit and select enough to complete the full amount of the grant, its purpose is that within this territory added for selection the grantee shall receive a full equivalent for the deficiencies in the place limits. Action by the administrative department which tends to accomplish this purpose is, to say the least, not inconsistent with justice. And in order that it be not defeated it is certainly not unreasonable to temporarily withdraw from private entry a sufficient body of land within such indemnity limits.

That in the actual administration of the Northern Pacific land grant such withdrawals of land within the indemnity limits were proper is clear from the certificate of the Commissioner of the General Land Office, of date May 2, 1896, and in evidence in this case, to the effect that there is a known deficiency of 3,559,222 acres of the grant which cannot be satisfied from the limits recognized in the department. As this certificate was the only evidence in the case and was incorporated by the trial court into its findings of fact, it would seem that our inquiry in this direction should be limited thereby. But in the opinion of the majority there is a reference to a report of the Land Department, made a year after the decision in this case, and to two opinions of the Secretary of the Interior, announced about the time of the decision. In these some question is made of the accuracy of this certificate. It will be noticed that in neither report nor opinions is the fact of a deficiency denied, but only a suggestion as to the amount thereof. It is, of course, not a pleasant fact that by reason of the change in the ruling and practice of the Land Department the Northern Pacific Railroad Company fails to receive the full measure of its grant, and I do not wonder at any effort to discredit the fact or minimize the amount of such loss, but I submit that in the disposition of this case we ought to be guided by the evidence before us and not be misled by recent speculations of the department concerning what may yet be developed.

Much is said about the vastness of this land grant, but it must be remembered that it was a grant of lands within what was then a wilderness. Though it was made in 1864, nothing was

done towards the building of the road until more than six years afterwards. Capital finds little temptation in a promise, no matter how great, of lands in an unknown wilderness.

The Land Department, believing that the power so constantly exercised by it and so frequently sustained by this court still continued, made orders of withdrawal as from time to time the maps of the line of definite location were filed and approved. Indeed, the question of power in respect to this very Northern Pacific grant was distinctly presented to Secretary Teller on May 17, 1883, and affirmed by him in a letter of instructions to the Commissioner of the General Land Office. 2 L. D. 511. See also Same 506. These withdrawals prior to the ruling hereafter noticed were over forty in number, and included substantially all the odd-numbered sections within the ten-mile indemnity limit from one end of the road to the other. They continued with unbroken regularity until the ruling referred to.

The first section of constructed road of twenty-five miles in length was accepted by the President on January 6, 1873, as having been finished on October 18, 1872. The last section of constructed road was accepted on July 10, 1888, as having been finished on June 11, 1888. During these years of construction, and of course as inducement to the company to continue the work undertaken, these various withdrawals were made. Not until 1887 was there any question of their validity. The first intimation appears in an opinion announced by Mr. Justice Lamar (then Secretary of the Interior) on August 13, 1887, (6 L. D. 84, 87,) in which he said:

"Were I called upon to treat as an original proposition the question as to the legal authority of the Secretary to withdraw from the operation of the settlement laws lands within the indemnity limits of said grants, I should, at least, have such doubts of the existence of any such authority as to have restrained me of its exercise. It would seem that the very words of the act, 'the odd-numbered sections of land hereby granted shall not be liable to sale, or entry, or preëmption before or after they are surveyed, except by said company, as provided in this act,' of themselves indicate most clearly the legislative will that there should not be withdrawn for the benefit of said

company from sale or entry any other lands, except the odd-numbered sections within the granted limits, as expressly designated in the act. But when the provision following this, in the very same sentence, is considered—'but the provisions of the act of September, 1841, granting preëmption rights, and the acts amendatory thereof,' and of the act entitled 'An act to secure homesteads to actual settlers upon the public domain,' approved May 20, 1862, 'shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company'—it is difficult to resist the conclusion that Congress intended that 'all other lands, excepting those hereby granted to said company,' shall be open to settlement under the preëmption and homestead laws, and to prohibit the exercise of any discretion in the executive in the matter of determining what lands shall or shall not be withdrawn."

Following this opinion Secretary Lamar revoked the orders of withdrawal theretofore made in behalf of some twenty-four corporations, the Northern Pacific Railroad Company among the number. Such revocation was undoubtedly legal, for the power which could order a withdrawal could revoke such order whenever in its judgment the appropriate time therefor had arrived. But such revocation did not disturb the rights which had become vested during the continuance of the orders of withdrawal. Thus consistency in the rulings and practice of the department was preserved.

Subsequently the question was presented to Secretary Vilas, who on August 2, 1888, in the case of the *Northern Pacific Railroad Company* v. *Miller*, 7 L. D. 100, ruled that all these withdrawals were void, thus upsetting that which had been done in the administration of this grant from the time of its inception.

It is unfortunate that during the years of construction, when it seemed important to hold out every inducement to the company to continue its work, the ruling and practice of the Land Department should have been unvarying in the line of securing to it the full amount of its grant, and that as soon as the road was completed and no further inducement to action by the com-

pany was needed the ruling of the Land Department should be changed, and that theretofore done with a view of securing to it the full amount of its grant be declared void. A change in the ruling of the department at that time was inauspicious.

Reference is made in the opinion to the duty of following in doubtful cases the construction placed by the Land Department. I fully agree with this, and I think it is a duty as incumbent upon the department as on the courts, and that when a construction has been once established in respect to a particular matter it should be followed by the department, unless plainly wrong; and that this court, when the question is presented, should hold to the original construction, especially if it be one which obtained during a score of years, and during all the time that the company was engaged in doing the work for which the grant was made, and should refuse to uphold a change made after that work was completed, and which has the effect of unsettling and destroying the rights of many created in reliance upon that construction.

Was the power of withdrawal rightfully exercised by the Land Department? It is not pretended that the Northern Pacific act contains any express denial or taking away of such power. The conclusion that it was taken away rests upon a mere implication, but it is familiar law that repeals by implication are not favored. If the old law and the new are consistent, and can with any reasonable interpretation of the latter be both enforced, they will be; and I respectfully submit that the same rule obtains as to powers belonging to and exercised by a department.

Was there any implied denial of this power to the Land Department? Section 6 of the granting act of July 2, 1864, c. 207, is relied upon by Secretary Vilas and by this court. I quote the section, 13 Stat. 369:

" That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or preëmption before or after they are sur-

veyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale."

Now, confessedly, every part of this section, except the clause commencing "but the provisions," and ending "to said company," applies solely to lands within the place limits, and has no reference or application to lands within the indemnity limits. By its connection, therefore, the natural application of this clause would be to lands within like limits. This natural application is enforced by the words "when surveyed," near the close of the clause, for there is an express provision (as appears in the first of the section) for a survey of the place limits, and there is no reference in the entire body of the act to any other survey. Further, the clause was seemingly necessary to secure beyond question to preëmptors and those seeking homesteads a full and continuous right to the even-numbered sections within the place limits. The preëmption law of September 4, 1841, 5 Stat. 456, defining the classes of lands to which preëmption rights should not extend, included therein the following:

"No sections of land reserved to the United States alternate to other sections granted to any of the States for the construction of any canal, railroad or other public improvement."

The act of March 3, 1853, 10 Stat. 244, which extended the preëmption right to the alternate reserved sections, contained this provision:

"*Provided,* That no person shall be entitled to the benefit of this act, who has not settled and improved, or shall not settle and improve, such lands prior to the final allotment of the alternate sections to such railroads by the General Land Office."

The exact scope of this limitation as applied to grants directly

to railroad companies may not be entirely clear. Perhaps the limitation began with the approval of the map of definite location which, as frequently held, determines the time at which the right of the company to the odd-numbered sections is established, or perhaps, at least in cases where the grant was to a State instead of directly to a company, at the date of the official certification to the State of the list of allotted lands. Such at least seems to have been the opinion of the Land Office, as shown by the rules announced. 1 Lester, 509. Be that as it may, some limitation was prescribed, and this clause was unquestionably introduced in order to remove all doubt as to the full and continuous right of preëmption in respect to the alternate reserved sections. The same provision was found in several land grants, as, for instance, that to the California and Oregon Railroad Company, July 25, 1866, 14 Stat. 239, c. 242; that to the Atlantic and Pacific Railroad Company, July 27, 1866, 14 Stat. 292, c. 278; that to the Stockton and Copperopolis Railroad Company, March 2, 1867, 14 Stat. 548, c. 189; that to the Oregon Central Railroad Company, May 4, 1870, 16 Stat. 94, c. 69; that to the Texas and Pacific Railroad Company, March 3, 1871, 16 Stat. 573, c. 122. That it did not apply to lands outside the place and within the indemnity limits is made clear by the fact that the provision was introduced into an act in which there were no indemnity limits, to wit, the act of July 13, 1866, granting lands to the Placerville and Sacramento Valley Railroad Company, 14 Stat. 94, c. 182.

Reference is made in the opinion of Secretary Vilas, approved by this court, to *United States* v. *Burlington & Missouri River Railroad Company*, 98 U. S. 334, as indicative that the words "on the line of said road" necessarily extend to lands within the indemnity limits. But that case justifies no such inference. There were no place or indemnity limits in terms prescribed. There was simply a grant of ten alternate sections per mile on each side of the road "on the line thereof." When the right of the company attached it was found that the full complement of the grant could not be satisfied by the ten successive alternate sections, and on application of the company patents were issued to it for certain lands beyond the limits of those sections,

and the court held on a bill to set aside these patents that the action of the Land Department was justified in that the full amount of the grant was intended and that there were no prescribed limits within which the grant must be satisfied.  It was said (p. 340) that the words " do not require the lands to be contiguous to the road ; and if not contiguous, it is not easy to say at what distance the land to be selected would cease to be along its line ; " and again, " and the land was taken along such line in the sense of the statute, when taken along the general direction or course of the road within lines perpendicular to it at each end."

It is also suggested that to disturb this decision of the Land Department in 1888 might work confusion in the administration of the grant and entail hardship on many who have acted in reliance upon that ruling.  I concede the hardship.  Every change in the ruling of the Land Department in the administration of a grant will almost inevitably work hardship upon some, but it is well to note the comparative hardships, and no better illustration can be presented than the case at bar ; and this irrespective of the loss by the company of a large portion of its promised lands.  The plaintiff in error immediately upon his application for an entry of the tract in controversy was notified that it was withdrawn.  He could then easily have changed his settlement to an even-numbered section and perfected his title thereto.  He persevered, however, in his application, and was finally allowed preëmption, paid his money and received his patent.  If that action were now adjudged void he would have a claim for the money paid and a claim against a solvent debtor.  Rev. Stat. sec. 2362.  On the other hand, the defendant in error, who purchased from the railroad company in reliance upon the then ruling of the department, paid to the company the sum of twelve hundred dollars, and has placed upon the lands improvements to the value of six hundred dollars.  All this he loses ; and while he may have a claim against the company for the amount of money he paid it, yet if it be true (as I am informed, although not appearing in the record) that mortgages upon the railroad company property have been foreclosed and all its property disposed of, his judgment will be

simply against an insolvent corporation. In other words, instead of a claim for reimbursement against a solvent debtor he will have what is tantamount to a judgment against a vacuum, and this will be the experience of all who, during those many years, purchased from the company in reliance upon the then ruling of the department.

For the reasons thus outlined I dissent from the opinion and judgment, and I am authorized to say that Mr. Justice SHIRAS concurs herein.