Booth, Judge,
delivered the opinion of the court:
This is a suit to recover the difference in pay between that of a rear admiral of the lower half of the grade and that of the upper half of the grade. The facts are not in dispute. The plaintiff was graduated from the Naval Academy in 1886. On April 27,1912, he had attained the rank of captain. On September 6, 1918, plaintiff was appointed a temporary rear admiral in the Navy, to date from July 1,1918. Subsequently, on August 19, 1919, he was appointed a permanent rear admiral and commissioned as such to date from April 7, 1919. On the date of plaintiff’s commission as permanent rear admiral there were 55 rear admirals, temporary and permanent, in the Navy, 27 of whom were in the upper half of that grade and 28 in the lower. Talcing the entire list as it then existed, plaintiff ranked as No. 35 on the same, and thereby fell into the lower half of the grade, and received the pay and allowances of a rear admiral of the lower half of the grade until February 7, 1921. On February 6, 1921, plaintiff’s senior in office, Bear Admiral George B. Clark, was retired, and plaintiff was regularly advanced the following day to the upper half of the grade. There were at the time 50 rear admirals of the line, exclusive of additional numbers on the active list, plaintiff ranking 25 on the list, and he has since received the pay and allowances of the upper grade. Plaintiff now insists that he should have received the pay and allowances of a permanent rear admiral of the upper grade from April 7, 1919, the date stated in his permanent commission, until February 7, 1921, the date when he was advanced to that grade. The reason for the plaintiff’s rank and pay, of which he complains, is the appearance *363 on the active list of a sufficient number of temporary rear admirals to maintain the full quota of the upper half of the grade and thus prevent his advancement thereto. In other words, the argument now advanced is that under the law all the permanent rear admirals in the Navy should have had preference over the temporary ones, and had such preference been given, the plaintiff would have been ranked as of the upper half of the grade from the date stated in his perma-anent commission. The Navy Department, adhering to an opinion of the Judge Advocate General, followed the course of ranking the rear admirals of the line on active duty in the order of their commissions, irrespective of permanent or temporary appointment, a course which did result in the situation now complained of. If the order of seniority should have followed tenure of office, then all permanent rear admirals should have preceded temporary officers, and a substantial difference in pay and allowances resulted, for the pay proper of a rear admiral of the upper half of the grade is $8,000 per annum and that of the lower half of the grade $6,000 per annum.
The act of March 3, 1899, 30 Stat. 1005, fixed the number of rear admirals on the active list at 18, and divided them for the purpose of pay into classes, the upper and lower 9, the upper grade receiving the greater pay, and this legislative policy of dealing with the subject continued until the passage of the act of August 29, 1916, commonly known as the National Defense Act.
By the terms of the National Defense Act, 39 Stat. 576, the total number of commissioned officers of the Navy was to be 4 per cent of the total authorized enlisted strength of the active list, with some exceptions unimportant to this controversy. The statute itself provided for the total number of commissioned line officers on the active list by expressly setting forth the proportionate number to be distributed. It likewise provided a method for attaining promotions in the service, fixed the grades from which promotions should be made, and prescribed a limit to eligibility by denying advancement to captains, commanders, or lieutenant commanders who had served less than four years in the grade he was serving on November 30 of the year of the convening *364 of tbe board set up for the purpose of carrying the act into effect. The executive board was to be made up of nine rear admirals appointed by the Secretary of the Navy; it must convene in December of each year, and rigid provisions were interposed to insure imp'artiality to eligible officers for promotion and a full consideration of their individual rights upon merit and not favoritism. The act of August 29,1916, was obviously intended to reorganize the Navy to a great extent, and to increase its efficiency and put its officers upon an equal basis, in accord with their rank and grade. Manifestly it was in many respects the culmination of previous controversies and differences with respect to preferences due and differences in pay and allowances awarded. One thing it did do — it removed the rigid provisions limiting the number of rear admirals of the line and fixed their number in proportion to the enlisted strength of the active list of the Navy.
On May 22, 1917, 40 Stat. 84, Congress, a little over a month after the war with Germany began, increased the active strength of the Navy from 87,000 to 150,000, which, of course, under the National Defense Act would have required the appointment of many additional permanent officers.
The act of May 22,1917, was clearly an emergency statute, passed to meet an acute situation and temporary in its character and terms, and Congress met the situation by providing for temporary appointments to advanced positions in the Navy, retaining with respect to the order and manner of making such promotions the wholesome provisions in that respect contained in the National Defense Act. The clear and manifest intendment of Congress in passing the act of May 22, 1917, was to materially increase the fighting forces of the Navy, make it ready for actual war service, and when the emergency passed to provide an express way and manner of resuming its peace status without injustice to its personnel. Officers holding permanent rank and grade at the time of the passage of the act, everything else being equal, were not to be supplanted by temporary officials. On the contrary, the temporary officer came along in the regular way provided for in the act of August 29,1916, filled in the vacan *365 cies created by the abnormal increase in tbe enlisted strength of the Navy, and occupied his temporary office invested with all the authority and responsibility of a permanent official of the same rank and grade during the continuance of his command. The record in this case fully discloses a rigid observance of the terms of the act of August 29,1916, by the President and the Navy Department in making all these temporary appointments, seniority and point of service was followed, and each rear admiral found his place on the list in the order of his appointment by the President and confirmation by the Senate, and was paid in accord with the same. If the plaintiff’s insistence is correct, the course followed was decidedly wrong. The Navy Department should have segregated the permanent rear admirals from the temporary ones, and given preference to the permanent officials in rank and grade, to the prejudice of the temporary officers, and this should have been done on the single hypothesis of tenure of office, for no claim is made of disparity in service, responsibility in office or fitness to discharge its duties. The plaintiff was appointed a temporary rear admiral to date from July 1,1918. According to his contention, if he had on that date, more than a year after the passage of the act of May 22, 1917, been appointed a permanent rear admiral instead of a temporary one, he should have ipso facto displaced a .temporary admiral who had been serving as such for many months, immediately reduce him in rank and pay, possibly at a time when war was flagrant, upon the single basis that for a limited time the plaintiff was outranked by reason of a sudden national emergency, which manifestly required the full strength and service of the Navy. Again, on April 7, 1919, when the plaintiff was commissioned a permanent rear admiral there were 11 captains who took precedence over him in virtue of the priority of the dates of their temporary rear admiral commissions, and of these captains the commissions of 8 antedated plaintiff’s commission as captain at the time he was made a permanent rear admiral. Therefore, to give effect to the contention advanced, the plaintiff would be immediately given preference over 8 captains in the Navy, all of whom were his seniors in point of service and who had *366 been appointed temporary rear admirals because of that fact, in accord with the National Defense Act. Is it not then apparent, from the facts set forth, that naught else but confusion, jealousy, and discord would have resulted from such a technical insistence as to preference during war time? Subsequent to the passage of the act of May 22, 1917, the Navy Department considered the question of preference, and the Judge Advocate General of the Navy rendered an opinion upon the subject, in which it is said, among other things: “ Eear admirals of the Navy on active duty serving under temporary commissions as such were considered in the same status in every respect, while holding such temporary commissions, as rear admirals on active duty holding permanent commissions as such,” and this course was followed throughout the entire emergency period. The Navy Department having so construed the statute, and having adopted the policy in accord with the Judge Advocate General’s opinion, we are precluded from overthrowing the same, unless it is clearly contrary to express provisions of law.
In the case of Reeves v. Ainsworth, 219 U. S. 296, 306, Mr. Justice McKenna in deciding a somewhat similar issue, used this language: “ The courts are not the only instrumentalities of government. They can not command or regulate the Army. To be promoted or to be retired, may be the right of an officer, the value to him of his commission, but greater even than that is the welfare of the country, and, it may be, even its safety, through the efficiency of the Army. And this was the motive of the act of October 1, 1890, and naturally its accomplishment was intrusted to the President.” The language is especially apropos when applied to the act of May 22, 1917. The courts will not, in cases of doubt, disturb the contemporaneous construction of executive officers charged with the execution of a law without very strong and cogent reasons. Brown v. United States, 113 U. S. 568 ; United States v. Philbrick, 120 U. S. 52; Hewitt v. Schultz, 180 U. S. 139; United States v. Sweet, 189 U. S. 471.
We look in vain for any express provision of law warranting the court in sustaining plaintiff’s contention. The argument in the brief is by way of inference, predicated pri *367 marily upon the status of a permanent rear admiral. It is asserted that such an officer holds but one office or rank; that he may only be deprived of the same by sentence of a court-martial or in mitigation thereof under Revised Statutes, sections 1229 and 1624; that such officers are appointed only after careful examination and selection by a board, whereas a temporary read admiral was limited in office to a time certain, holding a temporary commission without vacating his permanent one; that he might be removed by direction of the President, and finally he was to revert to his former status, in any event not later than December 31, 1921. The assertion is but an emphatic repetition of the provisions of the statute. Argumentatively it proves nothing, unless it may be said that one in permanent possession of a right is entitled to preference over a temporary one functioning in a temporary office provided by law and to which he was lawfully appointed.
A very different situation might arise if the plaintiff had been a permanent rear admiral at the time of the passage of the act of May 22, 1917, but he was not, and he did not attain the same until nearly two years thereafter. Congress possessed the undoubted power to do what it did do, and when Congress creates an office, either temporary or permanent, and expressly provides the method of filling the same, as well as the class which shall be eligible thereto, it is difficult to perceive upon what authority, in the absence of express words to that effect, a court may interpose and dispossess a temporary appointee lawfully appointed, in the interest of a permanent one afterwards appointed when there are sufficient offices for both. Especially is this so when to so hold involves a complete upset of the administration of the law under which the temporary officer was appointed by the department of the Government charged with its administration. It is true that the temporary officer did not by reason of his temporary appointment permanently lose his former status or commission. Congress did not intend to create an increased number of permanent officials for which the Navy in time of peace might not have need, and obviously desired to do justice to the personnel of the Navy. *368 While it did not vacate the temporary officer’s commission it did, in effect, suspend ,it ad interim and place the temporary officer in an office wherein his duties and responsibilities were upon an exact parity with the permanent official of the same rank in every respect save one, and that single exception had alone to do with length of service. It is a situation vastly different in character from one where an extra officer is appointed to assist or cooperate with an officer already performing the duties of that office, but who, by reason of increased burdens, must have assistance to meet a temporary exigency in the particular office. In this case independent positions were temporarily erected, and officials to supply the offices thus made were necessary, and when once legally installed therein were vested with the same authority as if permanently appointed. The duty was not extra; it was concurrent. The offices were equal in dignity and importance during their continuance and the qualification of officials the same.
The saving clause contained in section 13 of the act of May 22, 1917, supra, does not include a case like this. The plaintiff’s pay and allowances were not reduced by the passage of the act. They were increased. The proviso maintained the standard of pay and allowances provided by law for the officer in his previous permanent position. The fact that the act of May 22, 1917 enabled the plaintiff to be first advanced to a temporary office and subsequently to a permanent one does not bring his case within the terms of the proviso. Plaintiff was advanced under the act itself. What the proviso saved to him was the pay and allowances of a captain in the event his promotion resulted in pay of a lesser sum than provided by law for a captain.
During the emergency provided for in the act of May 22, 1917, it might have occurred that the changed status of an officer would result in a decrease in pay from what he was receiving under his permanent commission, and Congress very justly assured him that no decrease in pay would result from the passage of the act. The act did not forbid an increase, but merely prohibited a decrease, and saved to the officer affected the pay of his permanent rank in any event.
*369 The Navy Department recognized its inability under the law to grant the plaintiff the contention he now makes, for the Secretary of the Navy, on November 18, 1918, and again on January 21, 1919, addressed letters to the Speaker of the House, urging a change in the law, which would authorize the preference here insisted upon. The letters of the Secretary are forcible and convincing, but despite this fact Congress refused to adopt the course advised, and in the very next act (July 11, 1919, 41 Stat. 131, 138) reenacted, with additions, provisions of the acts of August 29,1916, and May 22,1917, again making no distinctions between the status of permanent and temporary appointments.
The act of July 11, 1919, contains this very significant language:
“ That the average numbered of commissioned officers of the line, permanent, temporary, and reserves on active duty, shall not exceed, during the periods aforesaid, 4 per cent of the total temporary authorized enlisted strength of the regular and temporary Navy, and members of the Naval Eeserve Force in enlisted rating on active duty and the number of staff officers shall be in the same proportion as provided under existing law.”
Congress having used language in a statute which has been construed in a prior statute, it is to be presumed that it intended to adopt the construction given to the prior act. Claflin v. Commomwealth Ins. Co., 110 U. S. 81; Sessions v. Romadka, 145 U. S. 29.
We have not discussed in detail the various statutes set forth in the findings and briefs of counsel. They are clearly available to trace the legislative steps which finally culminated in the passage of the National Defense Act and the act of May 22, 1917. There is apparently no language in any of them which positively confers upon an officer under the circumstances of this case a legal right of preference and hence increased pay and allowances. In our view of the case, Congress was especially concerned during the war in making the Navy a most formidable unit. To accomplish the desired end, its personnel must be largely increased, and Congress, having authority so to do, provided for the emergency in the way set out in the act of May 22, 1917. The *370 simple fact that one or more of the temporary rear admirals provided by the act subsequently failed to obtain a permanent commission as such in no way militates against their efficiency or dignity while serving in their temporary offices. They were the plaintiff’s seniors in point of time in the service, and they were not removed from command during the time they filled the office. There was a way pointed out to terminate their temporary service, and so far as the record discloses they were retained in service until the expiration of the time fixed by the act, and in the absence of some express enactment to that effect the court is unable to find sufficient reason in law to displace one or more of such officers on the single basis of preference due to a permanent officer, appointed subsequent to their appointment, an appointment made by the President and confirmed by the Senate in the same way as a permanent appointment is made by law.
There is another phase of this case which seems to have escaped attention. Plaintiff’s cause of action accrued when he was appointed permanent rear admiral on April 7, 1919. He did not file his suit in this court until May 7, 1922, more than three years after his cause of action arose. During all of this time another officer holding a temporary commission as rear admiral was drawing the pay and allowances which he now claims should have been paid to him. This court and the Supreme Court have held in a number of cases that where an employee of the Government by his laches has lost the right to have his title to the office from which he was removed tried, and another person has been appointed to said office and has been paid the salary thereof, the employee so dismissed can not maintain an action to recover such salary. Norris v. United States, 257 U. S. 77; Nicholas v. United State, id. 71; Arant v. Lane, 249 U. S. 367; Arant v. United States, 55 C. Cls. 327. The principle enunciated in these cases appear to apply with equal force to the instant case.
The petition will be dismissed. It is so ordered.
Graham, Judge; Hay, Judge; Dowhey, Judge; and Campbell, Chief Justice, concur.